UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                                   )
UNITED STATES OF AMERICA           )
                                   )
      v.                           )    Cr. No. 17-120 WES
                                   )
GREGORY LEE.                       )
_____)
```

## MEMORANDUM AND ORDER

WILLIAM E. SMITH, Chief Judge.

Before the Court is Defendant Gregory Lee's ("Defendant" or "Lee") Motion to Suppress (ECF No. 41). The Court held an evidentiary hearing on July 26, 2018 and heard argument on July 30. After careful consideration of the evidence and arguments, Defendant's Motion is DENIED.

I.  Findings of Fact

The Court gleans the following facts from the testimony of Officers Nicholas Dinardo and Robert King of the Warwick Police Department ("Department"), who were the only witnesses to testify, and the video footage[1] presented at the evidentiary hearing.

On the morning of August 5, 2017, at 8:37 a.m., the Department received a 911 call from a concerned caller about a male passed

_____

[1] The video footage was recorded through Lowe's parking lot security camera, which was admitted into evidence at the evidentiary hearing.

out or asleep in a vehicle parked in a Lowe's parking lot, on Greenwich Avenue in Warwick, Rhode Island. (Hr'g Tr. 9:23-25, 10:1-12.) Responding to the call, Officer Dinardo arrived on the scene soon after at 8:40 a.m. (Id. at 23:15-17, 41:23-25.)

Once on scene, Officer Dinardo located the gray SUV, two spots from the center, in the middle of the Lowe's parking lot. (Id. at 11:6-11.) The vehicle was off, with the windows rolled up. (Id. at 26:15-19, 49:12-13.) Officer Dinardo observed an individual, later identified as Lee, passed out or asleep in the vehicle. (Id. at 11:17, 12:3-4.) The officer proceeded to knock on the window several times. (Id. at 11:20-21.) After several knocks, Lee awakened, appearing startled, and began reaching under his body and legs, into the center console, and onto the passenger seat, looking for something. (Id. at 11:25, 12:1-8.) As Lee was rummaging through his vehicle, Officer Dinardo opened the driver's side door to maintain a visual of the vehicle's interior. (Id. at 12:9-13.) Lee turned in his seat in order to face Officer Dinardo directly. (Id. at 52:24-25, 53:1-7.)

With the door open, Officer Dinardo questioned Lee as to whether he was asleep, to which Lee responded that he did not feel well. (Id. at 12:16-19.) Officer Dinardo also inquired whether Lee was okay and whether he needed a rescue, to which Lee indicated he was fine and declined a rescue. (Id. at 53:15-25, 54:1-3.) Officer Dinardo testified that he observed Lee "sweating

profusely, shaking, stuttering," and displaying constricted pupils. (Id. at 12:20-23.) At this time, he began to suspect that Lee was "high on narcotics." (Id. at 12:24-25, 13:1-3.) Officer Dinardo also testified that "[i]mmediately, within the first couple seconds," he deemed Lee unable to operate a motor vehicle in his condition. (Id. at 15:20-25, 16:1-2.) Further, based on Lee's behavior and appearance, Officer Dinardo immediately suspected that Lee had narcotics in the vehicle. (Id. at 31:11-17.)

In response to Lee moving around in his vehicle, Officer Dinardo asked him to step outside and produce his driver's license. (Hr'g Tr. 13:14-16.) After doing so, Officer Dinardo testified that Lee turned his back on him and again attempted to reach into the vehicle, without Officer Dinardo instructing him to produce anything else. (Id. at 13:16-18, 27:19-25, 56:3-7.) To maintain a constant visual of Lee's hands, Officer Dinardo peered over Lee's shoulder. (Id. at 14:1-3.) He testified that he did not draw his weapon or handcuff Lee because, in his experience, when a suspect is high and wants to conceal something, they typically "do it right in front of you." (Id. at 14:6-20.)

Officer Dinardo then asked Lee why he was acting this way, to which Lee responded that "he was nervous around police." (Id. at 14:21-24.) Officer Dinardo also asked about any prior criminal history and where Lee was coming from. (Id. at 14:25, 15:1, 17:9-

10.)  Lee stated that he had previously been arrested for possession with intent to distribute narcotics, specifically cocaine and methamphetamine, and was coming from Provincetown at 3:30 a.m. to go to Walmart in Massachusetts and Lowe's in Warwick. (Id. at 15:3-11, 17:9-14.)  In response to Officer Dinardo, Lee indicated that he had not taken any medication or recreational drug.  (Id. at 66:2-10.)

At this point, Officer Dinardo returned to his cruiser to run checks on Lee and called Officer King for back up for "[o]fficer safety reasons and to continue the investigation."  (Hr'g Tr. 15:12-19, 16:21-24.)  While doing so, Officer Dinardo ordered Lee to stand at the front of the vehicle.  (Id. at 28:20-23.)  Officer Dinardo noted that Lee "wasn't able to stand still . . . His hands were playing with his shirt, in and out of his pockets.  He was walking around and appeared at one point to pick something up off the ground."  (Id. at 29:1-6.)  While running checks from the cruiser, Officer Dinardo asked Lee for additional information, and the video footage shows Lee handing something to the officer.  (Id. at 29:17-25, 30:1-2, 72:6-8.)  Officer Dinardo testified, however, that he could not recall the question or what Lee handed him.  (Id. at 30:1, 72:1-11.)

Once Officer King arrived on scene (approximately seven minutes after Officer Dinardo), Officer Dinardo asked him "to speak with Mr. Lee to get his feelings on his condition, behaviors."

(Id. at 16:15-20, 26:1-3.) After doing so, Officer King similarly concluded and informed Officer Dinardo that Lee was "most definitely high on something." (Id. at 17:2-6, 148:18-25, 149:1-8.) Lee also admitted his prior arrest to Officer King during their conversation. (Id. at 150:11-15.) At no point was a sobriety test administered. (Id. at 69:9-11.)

Following this brief conversation, Officers Dinardo and King continued to question Lee, asking him about his "drug of choice." (Id. 31:25, 66:15-18.) The officers brought Lee to the back of the vehicle, to verify his story and investigate whether he had shoplifted any items. (Id. at 32:1-9.) While there, the officers saw several Walmart bags. (Id. at 86:11-13.) Officer Dinardo testified that Lee consented to a search of the vehicle at the back of the vehicle, about five or six minutes after Officer King's initial arrival. (Id. at 32:19-24, 33:24-25, 34:1-5.) Officer Dinardo recalled asking Lee, "[i]f I were to look through your car right now would I find anything?" and then asking, "can I look through your car?" (Id. at 92:8-11.) Officer Dinardo elaborated that he "asked Mr. Lee if he wouldn't mind allowing [the officers] to look into his car, and [Lee] said that he would have no problem because he had nothing to hide." (Id. at 32:22-24.) Lee "even offered, Bring in the K-9s too." (Id. at 93:5-7.) Officer King at first indicated that officers acquired consent at the back of

the vehicle, but later noted he was unsure exactly when Lee gave consent. (Id. at 155:12-22, 183:16-25, 184:3-7.)

After conversing at the rear of the vehicle, the officers brought Lee to the back of Officer Dinardo's cruiser in order to search him, per department policy, before placing him in the cruiser. (Hr'g Tr. 33:1-11.) While searching his person, Officer King continued questioning Lee and advised him to empty his pockets. (See id. 36:16-18.) It was during this search that Officer King discovered a NYLO Hotel room key. (Id. at 37:5-10.) Lee explained that before arriving at Lowe's he had dropped off a friend at that hotel. (Id. at 37:17-19.) The video footage shows Lee being placed in the rear of Officer Dinardo's police cruiser, and, while there, both officers speaking to him for a considerable time period. Both officers testified that they had no recollection of what was said during that specific conversation. (Id. at 33:4-5, 106:9-25, 107:1-3.) Immediately following this conversation, Officer Dinardo returned to Lee's vehicle and entered it to conduct his search. (Id. at 39:11-17.)

The search began approximately fifteen minutes after Officer King arrived. (See id. at 39:19-21.) Officer Dinardo immediately searched the backpack in the front passenger seat of Lee's vehicle and found what appeared to be narcotics. (Id. at 40:1-4.) The officers then arrested Lee without incident. (Id. at 40:5-9.) At some point after the arrest, Lee's vehicle was towed and impounded.

(Id. at 42:25, 43:1-5.)  Earlier, the vehicle was subjected to a K-9 search that turned out to be negative.  (Id. at 111:24-25, 112:1-3.)

II. Discussion

A.    Welfare Check or Terry Stop?

In Terry v. Ohio, the Supreme Court of the United States held that protective searches for weapons in the absence of probable cause to arrest are constitutionally permissible because it is unreasonable to deny a police officer the right "to neutralize the threat of physical harm."  392 U.S. 1, 24 (1968).  The principles Terry outlined have been extended to traffic stops, as officers may "take similar measures to protect their safety, notwithstanding modest additional intrusion on the privacy rights of drivers and passengers."  United States v. Fernandez, 600 F.3d 56, 59 (1st Cir. 2010).  This Court has not uncovered a case that explicitly extends Terry and its progeny to welfare checks.

Welfare checks are "stop[s] [that] make sure the driver is okay and in condition to drive."  United States v. Rodriguez-Rodriguez, No. CR 06-0537 JB, 2006 WL 4079624, at *2 (D.N.M. Dec. 11, 2006).  Thus, welfare checks are intended primarily to ensure the driver's safety and wellbeing.  See id.  And, while not the primary focus of a welfare check, officer safety is always a concern during any situation involving an occupied automobile. See Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977) (noting

7

"inordinate risk confronting an officer as he approaches a person seated in an automobile"); Michigan v. Long, 463 U.S. 1032, 1048 (1983) ("Our decision [in Adams v. Williams, 407 U.S. 143, 148 n.3 (1972)] rested in part on our view of the danger presented to police officers in 'traffic stop' and automobile situations.").

Courts have found the typical safety concerns that are present in traffic stops to be equally present during welfare checks. See United States v. Alexander, No. CR417-056, 2018 WL 323945, at *2 (S.D. Ga. Jan. 8, 2018) ("While there was no traffic stop in this case, officers were approaching a vehicle [for the purpose of a welfare check] where the same unknowns to their safety existed."). Moreover, "the risk of a violent encounter in a traffic-stop setting 'stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop.'" Arizona v. Johnson, 555 U.S. 323, 331 (2009) (quoting Maryland v. Wilson, 519 U.S. 408, 414 (1997)). Thus, the concerns for officer safety during a traffic stop are similarly present during a welfare check.

B.    Opening the Vehicle Door

Before reaching the reasonable-suspicion inquiry, the Court must first determine whether Officer Dinardo opening the vehicle door at the start of his interaction with Lee constituted an illegal search and seizure.

"Generally, a law enforcement officer may only seize property pursuant to a warrant based on probable cause describing the place to be searched and the property to be seized." United States v. Coccia, 446 F.3d 233, 237-38 (1st Cir. 2006), cert. denied, 549 U.S. 1149 (2007) (citing Horton v. California, 496 U.S. 128, 133 n.4 (1990)). Exceptions to this requirement include the community caretaking exception. See Cady v. Dombrowski, 413 U.S. 433, 441, 446-47 (1973). "[T]he community caretaking exception has evolved into 'a catchall for the wide range of responsibilities that police officers must discharge aside from their criminal enforcement activities." Matalon v. Hynnes, 806 F.3d 627, 634 (1st Cir. 2015) (quoting United States v. Rodriguez-Morales, 929 F.2d 780, 785 (1st Cir. 1991)).

"In performing this community caretaking role, police are 'expected to aid those in distress, combat actual hazards, prevent potential hazards from materializing and provide an infinite variety of services to preserve and protect public safety.'" Coccia, 446 F.3d at 238 (quoting Rodriguez-Morales, 929 F.2d at 784-85). Importantly, the community caretaking function is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Cady, 413 U.S. at 441.

Courts have repeatedly found opening a vehicle door during the course of a welfare check to fall squarely within the community

caretaking function. See Cruz-Salazar v. State, 63 N.E.3d 1055, 1056-57 (Ind. 2016); Szabo v. State, 470 S.W.3d 696, 700 (Ark. Ct. App. 2015). A critical fact in each of these cases was that the suspect did not awaken in response to the officers' knocks. Here, however, Officer Dinardo's knocks did in fact arouse Lee from his slumber. See Blakemore v. State, 758 S.W.2d 425, 426, 428-29 (Ark. Ct. App. 1988) (justifying under community-caretaking function officer knocking on window and making inquiry, where officer observed the defendant "either asleep or passed out," defendant awoke, smelled of alcohol, and stumbled out of his car).

At the evidentiary hearing, Officer Dinardo testified that he saw Lee either "passed out or sleeping" and he had to knock repeatedly to awaken him. (Hr'g Tr. 11:15-17, 21-24.) Lee appeared startled and then began looking for something. (Id. at 12:1-8.) In response, Officer Dinardo opened the driver's side door. (Id. at 12:9-10.) While Officer Dinardo opened the door to maintain a full visual of the car (id. at 12:12-13), his purpose for doing so related to the community caretaking function and was "totally divorced from the detection, investigation, or acquisition of evidence." See Cady, 413 U.S. at 441. Indeed, his initial questions to Lee concerned his well-being and whether he needed a rescue. (Hr'g Tr. 53:9-25, 54:1.) At the time he opened the door, Officer Dinardo "did not know if [Lee] was ill, drunk, or merely asleep." Szabo, 470 S.W.3d at 700. Moreover, Officer

10

Dinardo testified he did not form the suspicion that Lee was under the influence of narcotics until after the door was open and he observed Lee's appearance. (See Hr'g Tr. 12:24-25, 13:1-3.)

In light of the totality of the circumstances, Officer Dinardo's decision to open the door, arising out of concern for Lee's welfare, fell squarely within the community caretaking function and therefore did not offend the Fourth Amendment.

C.    Reasonable Suspicion

The Fourth Amendment promises citizens the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Routine traffic stops constitute seizures under this provision. See Delaware v. Prouse, 440 U.S. 648, 653 (1979). To pass constitutional muster, an officer may not extend the duration of a traffic stop past what is reasonably necessary to effect the purpose of the stop, including, in the traffic-stop context, addressing the traffic violation that warranted the stop. See Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015). In determining whether the duration of the traffic stop was reasonable, courts must consider the "mission" of the traffic stop as well as an officer's need to "attend to related safety concerns." Id. (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)). Importantly, an officer may extend the duration of a

traffic stop if there is reasonable suspicion to believe criminal activity is afoot.  See id. at 1615.

The traffic-stop analysis works well in the context of this case.  Officer Dinardo's initial mission was a welfare check, which, by his own testimony, was completed within seconds of his interaction with Lee.  (See Hr'g Tr. 53:15-25, 54:1-7, 80:1-4.) Thus, to justify Lee's detention and the subsequent search of his vehicle, Officer Dinardo must have had a reasonable suspicion to believe criminal activity was afoot.  Rodriguez, 135 S. Ct. at 1615.

Reasonable suspicion demands "'a particularized and objective basis' for suspecting the person stopped of criminal activity." Ornelas v. United States, 517 U.S. 690, 696 (1996) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  This particularity in turn requires "that such a finding must be 'grounded in specific and articulable facts.'"  United States v. Espinoza, 490 F.3d 41, 47 (1st Cir. 2007) (quoting United States v. Hensley, 469 U.S. 221, 229 (1985)).

"Reasonableness" is considered under the totality of the circumstances.  See United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004).  This analysis "requires a practical, commonsense determination" that "entails a measurable degree of deference to the perceptions of experienced law enforcement officers."  United

States v. Dion, 859 F.3d 114, 124 (1st Cir. 2017) (internal quotations and citations omitted).

An investigatory stop is an ongoing process, and, because of that, "[t]he propriety of an officer's actions after an initial stop depends on what the officer knows (or has reason to believe) and how events unfold." United States v. Ruidíaz, 529 F.3d 25, 29 (1st Cir. 2008) (quoting Romain, 393 F.3d at 71) (alteration in original). "[A]s an investigation unfolds, an officer's focus can shift, and he can 'increase the scope of his investigation by degrees' when his suspicions grow during the stop." Dion, 859 F.3d at 125 (quoting Ruidíaz, 529 F.3d at 29). Indeed, "the police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess." Terry, 392 U.S. at 10.

Here, the facts support finding reasonable suspicion. Both officers noted that Lee appeared panicked and nervous; he was sweating profusely; his speech was erratic; he could not sit still; his pupils were constricted; and he had prior interactions with law enforcement. (Hr'g Tr. 12:8, 22-23, 148:20-25, 149:1-5.) While each of these facts, separately, may not support reasonable suspicion, see Illinois v. Wardlow, 528 U.S. 119, 124 (2000), the Supreme Court has articulated that these facts must be considered under the totality of the circumstances. See United States v. Arvizu, 534 U.S. 266, 274 (2002).

13

Each of the factors cited by Officer Dinardo has been routinely found to contribute to a finding of reasonable suspicion. See Wardlow, 528 U.S. at 124; United States v. Gilliard, 847 F.2d 21, 25 (1st Cir. 1988); United States v. Sanders, 248 F. Supp. 3d 339, 347 (D.R.I. 2017) (nervousness and furtive behavior); United States v. Drane, No. 13-cr-31-JL, 2014 WL 2940857, at *10 (D.N.H. June 30, 2014) (constricted pupils).

Moreover, Lee's nervous and erratic behavior persisted throughout the encounter, which brought Officer King to the same conclusion as Officer Dinardo. (Hr'g Tr. 148:18-25, 149:1-5.) During the extended detention, the officers learned of Lee's prior contact with law enforcement. (Id. at 150:10-15.) Prior arrests and criminal records are also routinely considered in the reasonable suspicion analysis. See United States v. McGregor, 650 F.3d 813, 821 (1st Cir. 2011); Dion, 859 F.3d at 127-28.

Defendant suggests that each fact the officers point to as establishing reasonable suspicion can be equally explained by a nonsuspicious reason. For example, being in a closed car on a summer morning without air conditioning may explain Defendant's profuse sweating. While perhaps true, officers are not obligated to dissect each fact and debate whether it may have an alternative explanation and, if so, discard it from the collection. The

calculus is more holistic than this — hence the term totality of the circumstances.[2]

Certainly, "a fact that is innocuous in itself may in combination with other innocuous facts take on added significance." Ruidíaz, 529 F.3d at 30. Police officers are not required to base their reasonable suspicion on facts that are incontrovertibly prejudicial to a suspect. Rather, "each act may be 'perhaps innocent in itself,' but taken together, the acts 'warrant[] further investigation.'" Dion, 859 F.3d at 125 (quoting Terry, 392 U.S. at 22).

In sum, Officer Dinardo's reasonable suspicion mounted as the stop progressed. As the officer's suspicions escalated, so too did the scope of the investigation. This is permissible. See id. at 124-25. Between both officers there was twenty-five years of experience on the scene — experience that is entitled to "a measurable degree of deference." Id. at 124. Officer Dinardo had the authority to continue questioning Lee, and to the extent it prolonged the stop, it did not flout the Fourth Amendment.

Following this prolongation based on reasonable suspicion, the officers searched the vehicle, with Lee's consent. The Court

---

[2] This deference to an officer's consideration of the gestalt of circumstances is not without limits, and has serious risk if it is misapplied or misguided, either because of lack of training or the failure to heed training. See Petro v. Town of W. Warwick ex rel. Moore, 889 F. Supp. 2d 292, 323-25 (D.R.I. 2012).

now turns to Lee's argument that he did not freely and voluntarily consent.

D.   Consent

Before reaching the merits of Defendant's arguments, the Court must determine when consent was given.

In general, "[a] party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding." Lima v. Holder, 758 F.3d 72, 79 (1st Cir. 2014) (quoting Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., 976 F.2d 58, 61 (1st Cir. 1992)).   In all events, judicial admissions must be statements of fact, not conclusions of law.   See Harrington v. City of Nashua, 610 F.3d 24, 31 (1st Cir. 2010) (citing In re Teleglobe Commc'ns Corp., 493 F.3d 345, 377 (3d Cir. 2007)).

When consent was acquired is unquestionably a statement of fact, and Lee, by his own assertion, stated that consent was given while at the rear of the vehicle.   (Def.'s Mem. in Supp. Mot. to Suppress ("Def.'s Mem.") 3, ECF No. 41-1. ("Following about seven (7) minutes of this tag-team and unnecessary questioning by two police officers at the rear of his vehicle, police asked Mr. Lee for consent to search inside his truck . . . Police then searched Mr. Lee's truck based on his reluctant consent.").)   Officer Dinardo confirmed this account of events at the evidentiary hearing.   (Hr'g Tr. 32:17-19, 91:12-25, 92:1-3.)   While Officer

16

King testified that he was less certain when consent was acquired (Hr'g Tr. 184:3-7), Defendant did not contest that consent was provided at the back of the vehicle. Thus, the Court determines that Lee consented to a search while at the rear of the vehicle.[3]

A search pursuant to valid consent is constitutionally permissible. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Consent must be voluntary, the determination of which requires examining the totality of the circumstances, including the person's "age, education, experience, intelligence, and knowledge of the right to withhold consent." United States v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999) (quoting United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993)). "The court can also consider 'whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances.'" United States v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999) (quoting Barnett, 989 F.2d at 555).

Here, nothing suggests the lack of freely given consent. In fact, Defendant only cites the presence of two police officers and

---

[3] As the Court pointed out in its questioning, with which Officer King did not disagree, the video suggests logically that consent may have been given while Defendant was in the police cruiser. But such an inference drawn from this silent video, while logical, is insufficient to overcome the testimony of Officer Dinardo, combined with Defendant's admission in his pleading.

their continued questioning as the reasons why he consented. (See Def.'s Mem. 12.) It is well settled, however, that the presence of multiple police officers is not enough to vitiate consent and officers are allowed to "inquir[e] into matters unrelated to the justification for the traffic stop." Johnson, 555 U.S. at 333; see also Dion, 859 F.3d at 130; United States v. Ramdihall, 859 F.3d 80, 89 (1st Cir. 2017); Fernandez, 600 F.3d at 60. The circumstances here suggest the absence of threats or coercion. Indeed, at the time Lee consented, he volunteered that officers could bring in the K-9s too. (Hr'g Tr. 93:5-10.) Furthermore, Lee had been previously arrested for possessing methamphetamines. See Dion, 859 F.3d at 130 (noting defendant's age and experience as factors in deeming consent voluntary). The record evidence bolsters the conclusion that Lee's consent was voluntary.

E.   De Facto Arrest

Even where no threat or coercion is employed, Lee's consent would be vitiated if he was under de facto arrest when he gave it.

"[A] de facto arrest occurs when 'a reasonable man in the suspect's position would have understood his situation, in the circumstances then obtaining, to be tantamount to being under arrest.'" United States v. Jones, 700 F.3d 615, 624 (1st Cir. 2012) (quoting United States v. Zapata, 18 F.3d 971, 975 (1st. Cir. 1994)). "Accordingly, in borderline cases, or in cases where arrest-like features are employed, the Court must 'assess the

18

totality of the circumstances' of the encounter in order to conduct a fact-specific inquiry." United States v. Mayen-Munoz, 844 F. Supp. 2d 251, 256 (D.R.I. 2012) (quoting Morelli v. Webster, 552 F.3d 12, 20 (1st Cir. 2009)).

The First Circuit has outlined a list of factors relevant to the analysis:

> length of the detention; restrictions placed on the individual's movement, by use of handcuffs or other means; use of force, such as forcing the suspect to the ground; information conveyed (or not conveyed) to the detainee, such as informing the detainee that he or she is under arrest or not under arrest or providing Miranda warnings; the number of law enforcement officers present at the scene; whether weapons were brandished; whether the encounter took place in a neutral location; and whether the suspect was transported to another location during the course of the detention.

Id. (collecting cases).

At the time Lee consented, both officers had questioned him for approximately thirteen minutes, Officer Dinardo had run background checks on Lee and the vehicle, and the officers had verified his story of shopping at Wal-Mart prior to the incident. (Hr'g Tr. 16:21-24, 32:22-24, 34:4-5, 86:11-13.) Although the length of his detention lends support to finding a de facto arrest, all other factors cut the other way. Lee's movements were not restricted, by handcuffs or otherwise. Although Officer Dinardo did order Lee to remain still several times throughout the encounter, the video footage shows Lee moving freely about, handing Officer Dinardo something while in the cruiser and bending down to

pick something up.  (Id. at 28:20-25, 29:1-6, 11-14.)  Moreover,
"there was no use of force; Defendant was not told he was under
arrest, nor was he Mirandized; there were only two officers at the
scene; no weapons were brandished; and the encounter took place in
a public, neutral location." Mayen-Munoz, 844 F. Supp. 2d at 256.

While "[n]o single factor is legally dispositive," the Court
finds that the facts at hand do not support a finding of a de facto
arrest.  Id. (citing Flowers v. Fiore, 359 F.3d 24, 31-32 (1st
Cir. 2004).  Therefore, as his detention was not tantamount to an
arrest, the voluntariness of Lee's consent is undisturbed.

F.    Inevitable Discovery

Alternatively, even if consent was not provided or it was in
some way tainted, the inevitable-discovery doctrine also dooms
Lee's Motion.  The First Circuit describes this doctrine as:

> Evidence which comes to light by unlawful means
> nonetheless can be used at trial if it ineluctably would
> have been revealed in some other (lawful) way, so long
> as (i) the lawful means of its discovery are independent
> and would necessarily have been employed, (ii) discovery
> by that means is in fact inevitable, and (iii)
> application of the doctrine in a particular case will
> not sully the prophylaxis of the Fourth Amendment.

Zapata, 18 F.3d at 978 (internal citations omitted).

Here, the facts check all three boxes.  There were
unquestionably narcotics in the vehicle and both officers
concluded that Lee was under the influence of narcotics and could
not operate a vehicle.  (Hr'g Tr. 15:20-24, 148:18-25, 149:1-5.)

Thus, if the officers impounded the vehicle, a routine inventory search would have been conducted and the narcotics inevitably discovered.

But this does not end the inquiry, because the impoundment decision must also be reasonable under the circumstances. Coccia, 446 F.3d at 239. "[L]aw enforcement officials are required to have a non-investigatory reason for seizing an arrestee's car in the first place." Vega-Encarnación v. Babilonia, 344 F.3d 37, 41 (1st Cir. 2003).

Defendant attacks the decision to impound the vehicle as unreasonable because officers had other available options. Here, however, no one was immediately available to take possession of the car, and "[c]ase law supports the view that where a driver is arrested and there is no one immediately on hand to take possession, the officials have a legitimate non-investigatory reason for impounding the car." Id. (citing United States v. Ramos-Morales, 981 F.2d 625, 626-27 (1st Cir. 1992)). Moreover, Officer Dinardo testified that the impoundment decision was made in part to protect the Department from allegations of theft and vandalism. (Hr'g Tr. 118:7-24.) Although the car was parked in broad daylight in a commercial plaza and likely not subject to vandalism, the reasons articulated by Officer Dinardo are well within the kind that courts have repeatedly upheld. See Coccia, 446 F.3d at 240; Ramos-Morales, 981 F.2d at 626. That other

options were available does not make the decision to impound the vehicle any less reasonable.  Therefore, discovery of the narcotics was inevitable.

III. Conclusion

For the reasons stated herein, Lee's Motion to Suppress (ECF No. 41) is DENIED.

IT IS SO ORDERED.

_William E. Smith_
William E. Smith
Chief Judge
Date:  August 15, 2018